**FILED IN CHAMBERS**
**U.S.D.C ATLANTA**

Date: Jul 20 2020

JAMES N. HATTEN, Clerk

By: /s/Sonya Lee Coggins

Deputy Clerk

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Petitioner,<br><br>v.<br><br>MOORE, INGRAM, JOHNSON &<br>STEELE, LLP;<br><br>Defendant. | CIVIL ACTION FILE NO.<br>1:20-cv-02413-LMM-LTW |

### MAGISTRATE JUDGE'S FINAL REPORT AND RECOMMENDATION

This matter appears before the Court on a Petition to Enforce an Internal Revenue Service ("IRS") summons filed by the United States of America ("Petitioner") pursuant to 26 U.S.C. §§ 7402 and 7604. [Doc. 1]. Respondent Moore, Ingram, Johnson & Steele, LLP ("Respondent" or "MIJS") filed its Answer to the Petition and a brief in opposition, and Petitioner a Response to MIJS's brief. [Docs. 8, 12, 13]. On June 18, 2020, the undersigned held a hearing regarding the Petition and this matter is now ripe for consideration. For the reasons set forth below, the undersigned **RECOMMENDS** that the Petition be **GRANTED in part and DENIED in part**, and that a special master be appointed, pursuant to Federal Rule of Civil Procedure 53, to resolve any remaining disputes.

## BACKGROUND

The IRS is conducting an investigation to determine whether Respondent is liable for, among other things, organizing and promoting abusive tax shelters, aiding and abetting in the understatement of another person's tax liability, and preparing or assisting in the preparation of tax returns for others that willfully or recklessly understate the taxpayer's tax liability. [Doc. 1, at 2]. The IRS believes Respondent is in possession of books, records, paper, and other data that may be relevant to the investigation. [Id. at 2–3].

According to Petitioner, Respondent provides management services to captive insurance companies ("Captives") that it created or assumed control over. [Doc. 13, at 2]. Generally speaking, a Captive is a subsidiary created by a business that purportedly provides insurance for the business. [Id.]. The business then pays insurance premiums to the Captive, deducts the premiums from its tax return, and can elect for the Captive to pay taxes on only the investment income, not the premiums. [Id. 2–3]. Such an arrangement is allowed by law, but some unscrupulous individuals abuse this tax structure. For example, a Captive might provide only redundant insurance or insurance against "esoteric, implausible risks for exorbitant 'premiums.'" See *Abusive Tax Shelters Again on the IRS "Dirty Dozen" List of Tax Scams for the 2016 Filing Season* (Feb. 16, 2016) (available at https://www.irs.gov

2

/newsroom/abusive-tax-shelters-again-on-the-irs-dirty-dozen-list-of-tax-scams-for-the-2016-filing-season, last accessed June 26, 2020).  This abusive funneling of excess profits into a Captive provides several benefits.  The business avoids taxes on its income paid as "premiums" but maintains control over those assets via its ownership of the Captive.  And because Captives are distinct legal entities, they can be used to shield assets from creditors and avoid estate taxes.

The legality of the Captives created and managed by Respondent are not at issue at this time.  Instead, "the IRS is still in the process of obtaining documents as part of its investigation" to determine if penalties are warranted.  [Doc. 13, at 5].  The IRS sent Respondent an Information Document Request ("IDR") on May 7, 2018, seeking documents relating to Respondent's Captive management practice.   [Doc. 9-7].  Respondent produced some, but not all, of the documents requested, and so the IRS issued the summons at issue in the Petition, again requesting the same documents requested in the IDR.  [Doc. 1-2].  When Respondent still failed to produce all of the requested documents, this litigation followed.

## **LEGAL STANDARD**

Under § 7602 of the Internal Revenue Code, the IRS is authorized "[t]o examine any books, papers, records, or other data which may be relevant or material" to an inquiry surrounding a taxpayer's tax liability, and may summon "any person having

3

possession, custody, or care of books of account containing entries relating to the business of the person liable for tax or required to perform the act." 26 U.S.C. § 7602(a)(1–2). If a person refuses to obey a summons, the IRS can petition for enforcement, as it did here. 26 U.S.C. § 7604(b). To obtain judicial enforcement of the summons, Petitioner must show: (1) "that the investigation will be conducted pursuant to a legitimate purpose," (2) "that the inquiry may be relevant to the purpose," (3) that the information sought is not already within its possession, and (4) that the administrative steps required by the Internal Revenue Code have been followed. United States v. Powell, 379 U.S. 48, 57–58 (1964). If Petitioner makes such a showing, the burden shifts to Respondent "'to disprove one of the four Powell criteria, or to demonstrate that judicial enforcement should be denied on the ground that it would be an 'abuse of the court's process.'" United States v. Centennial Builders, Inc., 747 F.2d 678, 680 (11th Cir. 1984) (quoting United States v. Beacon Fed. Sav. & Loan, 718 F.2d 49, 52 (2d Cir. 1983)).

## ANALYSIS

In opposing enforcement of the summons, Respondent argues that "the IRS possesses the bulk of the materials[,] and a vast majority, if not all, the non-privileged information, it still seeks." [Doc. 12, at 13]. Respondent further contends that the summons "was issued in bad faith and is overly broad." [Id. at 15–20]. Last,

4

Respondent asserts that it is ethically barred from producing much of the requested documentation due to attorney-client privilege and confidentiality obligations. [Id. at 20–25]. The Court addresses each of these arguments in turn.

## I.  Whether Petitioner Already Possesses the Documents Requested

As noted above, the IRS concedes that Respondent produced "some documents" responsive to certain categories identified in the summons. [Doc. 1-1, at 3]. And Respondent, for its part, does not actually contend that the IRS possesses all of the documents requested in the summons. Instead, Respondent contends "the IRS possesses all responsive documentation from 2009 to the present, not containing privileged communications between Respondent and its clients, or confidential client information." [Doc. 12, at 11]. Below, the Court will discuss what should be done about privileged/confidential information. But for now, the Court focuses only on whether any requested documents are "already within the [IRS's] possession." See Powell, 379 U.S. at 57–58.

Again, "some documents" certainly are. [Doc. 1-1, at 3]. But as Respondent concedes, it produced "hundreds of thousands of pages," while a full response to the summons would involve "millions of pages." See [Doc. 12, at 12, 14] (emphasis omitted). Even some of the documents Respondent did produce are incomplete. As Respondent admits, it produced only "templates of each insurance policy," not the

5

insurance policies themselves, and it intentionally withheld "the declaration page unique to each insured."  [Doc. 12, at 5].  The Court, obviously, will not order Respondent to provide documents already produced, except to the extent portions of those documents were withheld.  But Respondent readily admits it is in possession of millions of pages of documents not already produced.  Other than the documents it produced, Respondent also notes the IRS possesses documentation produced by Captive Resources, Inc. ("CRI"), Pinnacle Actuarial Resources, Inc. ("Pinnacle"), and Milliman, Inc. ("Milliman").  [Id. at 7].

This Circuit's precedent dictates that "actual possession of or access to information by the IRS is not an absolute bar to enforcement of a summons for that information."  United States v. Davis, 636 F.2d 1028, 1038 (5th Cir. 1981).[1]  The "already possessed" rule "is not a license to trim the edges of an otherwise valid summons."  Id.  Rather, the Court focuses on whether the "summons as a whole" is "unnecessary" within the meaning of § 7605(b).  Davis, 636 F.2d at 1038.  If "the bulk of the materials summoned is not demonstrably in the possession of the IRS, and . . .

---

[1] United States v. Davis, 636 F.2d 1028, 1038 (5th Cir. 1981) was decided in February 1981 and as such is binding.  See Bonner v. City of Prichard, Ala., 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc).

the marginal burden of supplying information which might already be in the possession of the IRS is small," the summons should be enforced in its entirety.  Id.

The biggest problem with Respondent's argument is that it is based entirely on documents produced to the IRS *after* the summons at issue.  The fact that Respondent produced hundreds of thousands of pages *after* it received the summons does not demonstrate that the summons sought unnecessary documents.  See [Doc. 9-1, at 17–18, ¶24].  Quite the opposite.  It shows that, at the time the summons was issued, the IRS was seeking hundreds of thousands of pages of indisputably responsive, unprivileged documents in Respondent's possession that had not yet been produced. Likewise, the summonses issued to CRI, Pinnacle, and Milliman are no evidence whatsoever that the summons at issue in this case was "unnecessary."   Those summonses were issued *after* the summons issued to Respondent, and thus they are not evidence Respondent's summons was seeking information already in the IRS's possession.  [Doc. 12-4].

Contrary to Respondent's argument, it fails to demonstrate that the IRS possesses "the bulk of the materials" sought in the summons.  See [Doc. 12, at 13].  As Respondent admits, it fully responded to each request with respect to only 4.5% of its Captives—the Captives already under IRS audit.  [Id. at 12].  Respondent produced some "template[s]" and a scattered few other documents, but ultimately only produced

"hundreds of thousands of pages" out of the "millions of pages" it possesses.  See [Id. at 12, 14] (emphasis omitted).  As for the documents produced by CRI, Pinnacle, or Milliman, it is not clear how many documents were actually produced.  During the hearing, Respondent stated that CRI produced some 15,000 documents and that Pinnacle produced some indeterminate number of documents relating to their actuarial services.  [Doc. 16, at 28:20–29:6].  But again, by Respondent's own estimation, the summons is seeking "millions of pages" of documents involving far more than just actuarial services.  See [Doc. 12, at 14]; see also [Doc. 16, at 30:10–15].

The fact Respondent produced some documents in response to the summons hardly demonstrates that the summons was "unnecessary," and the fact Respondent only produced a small portion of the documents demonstrates that enforcement of the summons is warranted with respect to the remainder.  As for the documents requested from CRI, Pinnacle, and Milliman; Petitioner correctly points out that it requested a subset of documents from those other sources only *after* Respondent refused to produce documents.  [Doc. 13, at 11].  Even assuming CRI, Pinnacle, and Milliman produced each and every document requested, those documents are not "the bulk of the materials" sought in the summons at issue in this case.  Compare [Doc. 12-4] with [Doc. 1-2].  As such, the Court concludes that "the bulk of the materials summoned [are] not demonstrably in the possession of the IRS."  Davis, 636 F.2d at 1038.

8

Respondent next addresses the burden imposed by the summons, but incorrectly focuses on whether the IRS "already possesses sufficient information . . . to make a determination as to whether Respondent promoted abusive tax shelters." [Doc. 12, at 13–15]. As Respondent freely admits, it possesses "additional documentation" not in the IRS's possession. See [id. at 14]. But Respondent would have the Court refuse to order the production of those documents based on Respondent's assertion that the small portion of documents possessed by the IRS should be "sufficient." See [id. at 14]. Respondent cites no authority suggesting that it can curb the investigative authority of the IRS by producing only that subset of documents that it, in its magnanimous discretion, deems to be "sufficient."  As Petitioner pointed out during the hearing, Respondent faces potential liability for its conduct with respect to each separate client for each distinct tax year. [Doc. 16, at 38:18–39:3].  Thus, even if the information Respondent produced with respect to the 4.5% of clients already under IRS investigation were "sufficient," that would not absolve Respondent of its duty to produce documents with respect to the other 95% of its clients.  Each transaction is its own, separate potential basis for liability.

Respondent has "at most" presented "grounds for limiting enforcement of the summons to those documents not already in the IRS's possession, rather than completely denying enforcement." Davis, 636 F.2d at 1037.  The present inquiry is

not whether the summons as a whole is burdensome, but rather what burden is imposed on Respondent if it is required to "supply[ ] information which might already be in the possession of the IRS." Id. at 1038.  To the extent Respondent already produced certain documents, the Court can see no reason why it should be compelled to produce those documents again.[2]  They would be nothing but identical versions of the same thing produced by the same party, and the cost of producing them again would be wholly unnecessary.

But of the "millions of pages" not produced by Respondent, some few thousand would potentially overlap with documents produced by CRI, Pinnacle, and Milliman. To be sure, the Court could attempt to "carve[ ] out of the summons [such] information already in the IRS'[s] possession." See Miccosukee Tribe of Indians of Fla. v. United States, 877 F. Supp. 2d 1331, 1345 (S.D. Fla. 2012).  But "even if the IRS possesses a small portion of the documents, this possession does not bar enforcement of the [summons]." Id. at 1346. The Court need not pour over the millions of pages of Respondent's documents to sort out the small portion that might overlap with those produced by CRI, Pinnacle, and Milliman.  A person summoned cannot delay the

---

[2] The Court is referring only to the exact documents already produced by Respondent.  The fact that Respondent produced "template insurance policies" does not mean it can avoid producing complete, final versions of the insurance policies. See [Doc. 12, at 12].

summons through "the detailed discovery, prolonged cross-examination, and possible *in camera* inspection necessary to sort out a relatively small number of documents, the contents of which may already be known to the IRS, when it is probable that the person summoned has no substantial interest in anything but the delay itself." Davis, 636 F.2d at 1038.

As Judge Janet King has explained, the IRS can have a "legitimate investigative reason for obtaining" ostensibly duplicative materials from different parties because it needs "to compare the documents to ensure completeness of the production." United States v. Greenberger, No. 1:15-CV-03532-AT-JFK, 2016 WL 3912065, at *10 (N.D. Ga. Jan. 11, 2016), report and recommendation adopted, 2016 WL 3912060 (N.D. Ga. June 21, 2016). To the extent some of the documents possessed by Respondent might overlap with documents produced by third-parties, the Court concludes that "burden of supplying [such] information which might already be in the possession of the IRS is small." See Davis, 636 F.2d at 1038. Absent evidence that the IRS's actions were harassing, which will be discussed more below, the fact a respondent might have to produce "exact electronic duplicates" of some documents does not bar enforcement of the summons. United States v. Greenberger, No. 1:15-CV-3532-AT, 2016 WL 3912060, at *1 (N.D. Ga. June 21, 2016).

## II.   <u>Whether the Summons is an Abuse of Process</u>

Respondent next argues the summons was issued in bad faith but fails to present sufficient evidence to support its position.   Respondent contends that the IRS has "refus[ed] to review the substantial documentation already in its possession," but presents no actual evidence on this point.  <u>See</u> [Doc. 12, at 15].  Instead, Respondent simply assumes the IRS must not have reviewed the documents because, Respondent contends, that documentation is sufficient to make a "determination as to [the] applicability of promoter penalties" and no such determination has been made.  <u>See</u> [<u>id</u>. at 15–16].

Contrary to Respondent's argument, there is no evidence that the documentation provided gives "a complete picture of its captive insurance practice."  <u>See</u> [<u>id</u>. at 16, n.5].   Rather, Respondent provided rough drafts of some documents and other documents relating to clients already under IRS investigation.  <u>See</u> [<u>id</u>. at 11–12].  Even if the documents with respect to those clients were "sufficient," that does not mean the IRS is acting in bad faith by attempting to enforce the summons.  Respondent cannot just provide information relating to a cherry-picked handful of clients and demand the IRS not investigate Respondent's activities with respect to the other 95% of its Captives. Each individual relationship is distinct, and the fact Respondent abided by

the law when managing a subset of clients is not "sufficient" to conclude Respondent abided by the law in managing all the Captives.

More importantly, Respondent's argument has no basis in law. In order to agree with Respondent's position, the Court would need to review the documents in the IRS's possession and decide if they are, in fact, "sufficient to make [a] determination" with respect to every possible violation the IRS might want to investigate. See [Doc. 12, at 16]. Respondent cites to no authority, and this Court has found none, holding that courts should engage in such a practice. See [id. at 15–19]. It is not the Court's role to "oversee the [IRS's] determinations to investigate." Powell, 379 U.S. at 56. "The purpose of a summons is 'not to accuse,' much less to adjudicate, but only 'to inquire.'" United States v. Clarke, 573 U.S. 248, 254 (2014) (quoting United States v. Bisceglia, 420 U.S. 141, 146 (1975)). The Court is not here to adjudicate whether the IRS possesses "sufficient" information for its investigation and will not conclude the IRS is acting in bad faith based on nothing but Respondent's naked assertion that the documents already produced are enough. See Clarke, 573 U.S. at 254 (holding that "[n]aked allegations of improper purpose are not enough").

Respondent next argues that the "IRS has weaponized the promoter penalty statutes to intimidate and harass captive managers." [Doc. 12, at 16–17]. But the only evidence it cites is the declaration of its own attorney, who vaguely states that the IRS

13

"has issued approximately a dozen similar summonses" but that it has yet to assert "promoter penalties under the Tax Code against any of the captive managers." [Doc. 9-1, at 20–21, ¶28]. Thus, all Respondent has shown is that the IRS has conducted a small number of investigations that have not yet resulted any actual penalties. The mere fact that *other* captive managers abided by the law—or at least have not been prosecuted yet—is not evidence the IRS acted in bad faith by deciding to investigate Respondent.

Respondent next focuses on the alleged nefarious actions of IRS District Counsel Diana Wells. [Doc. 12, at 17]. Respondent first notes Ms. Wells was counsel in several audits of Respondent's clients and that some of those clients filed petitions in Tax Court. [Id., at 17]. Relying on the Eleventh Circuit's decision on remand in Clarke, Respondent notes "it would clearly be an improper purpose for the IRS to issue a summons in bad faith outside a legitimate investigation, with the sole motive of circumventing tax court discovery." [Doc. 12, at 17 n.7] (quoting United States v. Clarke, 816 F.3d 1310, 1317 (11th Cir. 2016)). But the Eleventh Circuit went on to hold that the mere existence of related tax court cases is not proof that the summons was issued to circumvent tax court discovery. See Clarke, 816 F.3d at 1318 ("That the IRS could conceivably attempt to introduce evidence from these summonses in the

pending tax litigation does not rise to the level of an abuse of process contemplated by Powell.").

Even accepting that the Tax Court cases are related to the summons at issue in this case, that alone does not create a plausible inference the summons was issued in bad faith. That is especially so here because the Tax Court cases involved only a handful of Respondent's clients, and the summons seeks information relating to all of Respondent's clients. See [Doc. 1-2]. Discovery in the Tax Court cases necessarily would not have involved the vast majority of documents at issue, and thus there is no evidence the summons was issued to avoid the tax court's discovery procedures. If anything, the fact that several of Respondent's clients were under investigation for allegedly using abusive tax shelters proves the IRS had a legitimate basis for investigating Respondent for allegedly promoting such abusive tax shelters to its clients.

Respondent next notes that the summons was issued "almost exactly a month after Respondent filed a formal complaint against [Ms. Wells]" for supposedly "inappropriate behavior." [Doc. 12, at 17]. But Respondent had already been under investigation for nearly a year before it made the complaint against Ms. Wells. [Docs. 9-6, 9-10]. The Court cannot conclude that the IRS acted in bad faith simply

by continuing an already ongoing investigation just because Respondent decided to complain about one of the investigators.

Looking to the substance of Respondent's complaint, it does not demonstrate bad faith, abusive harassment. Instead, an IRS auditor—not Ms. Wells—insisted on interviewing the owner of a captive even though he maintained that he "did not participate in the daily management of the captive." [Doc. 9-10, at 2]. The auditor then insisted the owner appear in person at an IRS office, which Respondent "assume[d] . . . was purely an intimidation tactic intended to bully and intimidate" the owner. [Id. at 3]. Ms. Wells, for her part, allegedly "interrupted the auditor to ask direct questions," even though Respondent asked her "not to speak directly" to the owner. [Id.]. Respondent contends this "demonstrates her excessively aggressive and rude behavior." [Id.]. Ms. Wells also "initially demanded that [the owner] turn over his personal notes," allegedly doing so "[w]ith a hostile attitude." [Id.]. Notably, there is no evidence that Ms. Wells' superiors ever decided to investigate, sanction, or reprimand her based on Respondent's complaint.

Thus, a single investigator involved in this case allegedly had a "hostile attitude" and engaged in "rude behavior" during an interview of one of Respondent's clients in an unrelated audit. Respondent then complained about this "inappropriate behavior," and now argues that the summons in this case must have been bad faith retaliation. See

16

[Doc. 12, at 17]. As noted above, Respondent had independently been under investigation for nearly a year at the time it filed the complaint. The Court concludes that such flimsy evidence is not enough to "give rise to a plausible inference of improper motive." Clarke, 573 U.S. at 254.

Last, Respondent notes that "the IRS has refused Respondent's offers for a conference to communicate its practices and procedures and to address any questions the IRS may have regarding the same." [Doc. 12, at 18]. But Respondent fails to cite a single authority indicating that the IRS has any obligation to agree to such a conference,[3] and the Court has not found a single case where enforcement of a summons was denied on such a basis. If Respondent would simply produce the documents identified in the summons, there would be no need for any conference to discuss Respondent's practices and procedures. If the IRS then decides a conference is necessary after it has had a chance to review properly summonsed documents, it can request one. But Respondent cannot simply demand the IRS conduct an interview in lieu of producing properly summonsed documents.

---

[3] Respondent does suggest "Petitioner has arguably violated Northern District of Georgia Local Rule 37.1 and Judge May's Standing Order Regarding Civil Litigation" by not agreeing to a conference. [Doc. 12, at 18 n.8]. But this argument is surprising, since neither the Court's Local Rules nor any Judge's standing order applied prior to the filing of this action.

17

Respondent also argues enforcement of the summons would be an abuse of process because the summons is overbroad.  [Doc. 12, at 19–20].  "An IRS summons is overbroad if it 'does not advise the summoned party what is required of him with sufficient specificity to permit him to respond adequately to the summons.'"  United States v. Medlin, 986 F.2d 463, 467 (11th Cir. 1993) (quoting United States v. Wyatt, 637 F.2d 293, 302 n. 16 (5th Cir. Feb. 17 1981)).  Here, Respondent does not argue that the summons fails to advise it of what is required with sufficient specificity to permit it to respond.  As Respondent's counsel freely admitted during the hearing, "We understand what they want . . . we understand what they want and can discern it."  [Doc. 16, at 27:21–22].  Instead, Respondent's argument is that the summons is overbroad because the IRS is requesting "all, all, all," *i.e.* all documents, relating to all clients, for the entire eleven-year history of Respondent's Captive practice.  [Id.].

The authority in this Circuit is clear that a summons is not overbroad so long as it "specif[ies] the detailed subject matter of the documents requested, the source of those documents, and the limited time period . . . from which the documents were to be drawn."  See, e.g., Miccosukee, 877 F. Supp. 2d at 1346.  To be sure, Powell and § 7602 itself impose limits on how far a summons can go, and the Court can envisage other circumstances that might be called "overbroad."  If, for example, the IRS requested documents relating to Respondent's commercial real estate, zoning and land

use practice, that request would be overbroad.  But not because of the volume of documents requested.  Rather it would be because such documents are not "relevant or material" to the issue of Respondent's captive management practice, *i.e.* they would not be sought for "a legitimate purpose" and would not "be relevant to [any legitimate] purpose."  See 26 U.S.C. § 7602(a)(1); Powell, 379 U.S. at 57.

The Court cannot say that the summons at issue in this case is so overbroad as to be an abuse of process.  The documents sought are clearly relevant to the IRS's investigation of Respondent's captive management practice and Respondent admits that the documents being requested are identified with sufficient specificity.  See [Doc. 1-2].  Additionally, the requests span a limited—albeit eleven year—timeframe.[4] Respondent fails to cite a single case or any binding authority holding an IRS summons is overbroad simply because it requests a large number of documents.  [Doc. 12, at 19–20].  Under the circumstances, the Court concludes that enforcement of the summons would not be an abuse of process.

## III.   <u>Whether Requested Documents are Privileged or Confidenti</u>

Respondent's last argument is that it "is ethically barred by privilege and

---

[4] As Petitioner's counsel pointed out during the hearing, the volume of documents would have been less if Respondent had fully replied to the IDR, sent over two years ago.  See [Doc. 16, at 39:3–9]; see also [Doc. 9-7].

confidentiality obligations from producing much of the requested documentation." [Doc. 12, at 20–25]. As mentioned above, Respondent asserts it has already produced all responsive documents "not containing privileged communications between Respondent and its clients, or confidential client information." [Id. at 11]. Thus, it appears the real crux of the dispute between the parties is whether the millions of documents *not* produced by respondent are indeed privileged. Respondent points out that two Kentucky District Courts have already ruled that certain documents are privileged and that the privilege had not (yet) been waived. See [Doc. 9-15]. But those cases are not proof that "all correspondence solely between Respondent and its captive clients are privileged and protected from production," as Respondent contends. See [Doc. 12, at 22].

Neither case involved the withholding of millions of pages of documents, as Respondent seeks to do here. One involved "140 email communications" specifically listed in a privilege log, and the other also involved emails with a handful of Respondent's clients that were specifically "identified in their revised privilege logs." [Doc. 9-13, at 2, 8]. There is no indication that Respondent's clients withheld "all correspondence solely between Respondent and [them]," which is what Respondent deems "privileged." See [Doc. 12, at 22]. The Eleventh Circuit has explicitly rejected "the argument that *any* communication between an attorney and client is protected by

20

the privilege." In re Grand Jury Matter No. 91-01386, 969 F.2d 995, 997 (11th Cir.

1992) (emphasis in original).  Respondent must also show that legal advice was sought,

that the communication related to that purpose, that Respondent was acting in its

capacity as a professional legal advisor—not a claims adjuster—and so on.  See

Universal City Dev. Partners, Ltd. v. Ride & Show Eng'g, Inc., 230 F.R.D. 688, 690

(M.D. Fla. 2005); see also Carpenter v. Mohawk Indus., Inc., No. 4:07–CV–0049–

HLM, 2007 WL 5971741, at *9 (N.D.Ga. Oct. 1, 2007) ("When advice given by an

attorney relates to both business and legal matters, the legal advice must predominate

in order for the attorney-client privilege to apply."); In re Grand Jury Investigation, 842

F.2d 1223, 1226 (11th Cir. 1987) ("The attorney-client privilege does not protect

communications made in furtherance of a crime or fraud.").

    The Magistrate Judges in the Kentucky cases did not just simply accept the

respondents' assertion of privilege.  They each "concluded that an *in camera* review

must be conducted of all the emails . . . to determine whether the attorney-client

privilege applies to each of the withheld emails."  [Doc. 9-13, at 8]; see also [id. at 2].

This is so because the person invoking the privilege "bear[s] the burden of proving its

existence."  In re Grand Jury Investigation, 842 F.2d at 1225.  Even if the specific

emails determined to be privileged in the Kentucky cases are in fact privileged,

Respondent has not met its burden of showing "all correspondence solely between

Respondent and its captive clients are privileged" by that fact alone.  See [Doc. 12, at 21–22].

Notably, respondent only argues that certain "correspondence" is privileged. See [id.].  Respondent appears to concede that it has not produced a substantial amount of "documentation," which it contends is confidential, not privileged.  See [id. at 23]. Not all confidential information is privileged, and Respondent cannot avoid disclosing non-privileged confidential information if it is required to do so "by order of the court." Ga. R. Prof. Conduct 1.6(a).  But Respondent correctly notes that the Eleventh circuit has created a narrow "exception to the normal rule that a client's identity is not privileged . . . known as the 'last link' doctrine." In re Grand Jury Proceedings 88-9 (MIA), 899 F.2d 1039, 1043 (11th Cir. 1990).  "In essence, the last link doctrine extends the protection of the attorney-client privilege to nonprivileged information— the identity of the client—when 'disclosure of that identity would disclose *other*, privileged communications (e.g., motive or strategy) and when the incriminating nature of the privileged communications has created in the client a reasonable expectation that the information would be kept confidential.'" Id. (quoting Rabin v. United States, 896 F.2d 1267, 1273 (11th Cir.1990)) (emphasis original).

Respondent argues that "disclosure of Respondent clients' identities could subject each taxpayer to unnecessary harassment through IRS examination." [Doc. 12,

22

at 23–24].  But the only case cited by Respondent deals with clients who hired counsel in criminal matters.  See United States v. Garland, Case No. 1:91-CV-2267-ODE, 1992 WL 138116, at *7 (N.D. Ga. Apr. 9, 1992); see also In re Grand Jury Proceedings 88-9 (MIA), 899 F.2d at 1043 (noting the last link doctrine protects the identity of a client if it "could form the chain of testimony necessary to convict an individual of a federal crime").  Respondents have cited no authority indicating that a mere IRS audit is covered by the last link doctrine.  See [Doc. 12, at 23–24].  As the Supreme Court has held, when the party summoned "is itself under investigation," "any incidental effect on the privacy rights of unnamed taxpayers is justified by the IRS's interest in enforcing the tax laws."  Tiffany Fine Arts, Inc. v. United States, 469 U.S. 310, 321 (1985).  Even assuming the last link doctrine is potentially applicable, Respondent omits a crucial element in the analysis.

Respondent cannot just show that disclosure of its client's identity would lead to "harassment."  It must show that the disclosure of the "usually nonprivileged information will reveal other privileged information."  In re Grand Jury Proceedings 88-9 (MIA), 899 F.2d at 1043.  Absent such a showing, the last link doctrine does not apply.  Id.  Just like in the case relied on by Respondent, here Respondent makes no argument that the "disclosure [of its clients' identity] will otherwise reveal privileged attorney-client communication."  Garland, 1992 WL 138116, at *7; see also [Doc. 12,

23

at 23–24].  As such, Respondent has not shown that the last link doctrine protects any of the otherwise nonprivileged information it seeks to withhold.  <u>See</u> <u>In re Grand Jury Proceedings 88-9 (MIA)</u>, 899 F.2d at 1043; <u>Garland</u>, 1992 WL 138116, at *7.  Absent such a showing, confidentiality alone is not enough to protect the information from disclosure, because nonprivileged confidential information must be disclosed if required "by order of the court."  Ga. R. Prof. Conduct 1.6(a).

## CONCLUSION

For the foregoing reasons, the undersigned **RECOMMENDS** that the Petition be **GRANTED in part and DENIED in part**.  As explained above, the undersigned **RECOMMENDS** that the Petition be **DENIED** as to the specific documents Respondent itself has already produced, but that the Petition otherwise be **GRANTED**.

The last argument in Respondent's brief does not deal with what documents should be produced, *per se*, but rather deals with what kind of privilege log it should produce.  [Doc. 12, at 24–25].  Respondent contends that a categorical privilege log is appropriate because "the additional information to be gleaned from a more detailed log would be of no material benefit."  [<u>Id</u>. at 24].  The undersigned believes such a privilege log is not sufficient in this case.  As discussed above, the Eleventh Circuit has rejected Respondent's sweeping "argument that *any* communication between an attorney and client is protected by the privilege."  <u>In re Grand Jury Matter No. 91-01386</u>, 969 F.2d

24

at 997 (emphasis in original).  Determining whether the attorney-client privilege applies requires an analysis of each document individually, as occurred in the Kentucky cases.

But as Respondent notes, the material at issue in this case is voluminous.  See [Doc. 12, at 24].  Because neither an available district judge or magistrate judge of this District can handle such a volume of allegedly privileged materials in an effective and timely manner considering the Court's docket, the undersigned **RECOMMENDS** that a special master be appointed to resolve discovery disputes between the parties.  See Fed. R. Civ. P. 53(a)(1)(C).  Additionally, because allocating the payment of the special master among the parties depends on issues not yet fully developed, the undersigned further **RECOMMENDS** that the Court withhold ruling on that issue at this time.  See Id. 53(g)(3).  To the extent the parties have any objections to the appointment of a special master or wish to suggest candidates for appointment, they should raise those issues in any objections to this Report and Recommendation.  Id. 53(b)(1).

As this is a Final Report and Recommendation and there are no other matters pending before the Court, the Clerk is directed to terminate the reference to the undersigned.

**SO ORDERED AND REPORTED AND RECOMMENDED**, this   20

day of July, 2020.

LINDA T. WALKER
UNITED STATES MAGISTRATE JUDGE